---

THE P. R. R. NO. 5.

(Circuit Court of Appeals, Second Circuit. June 14, 1910.)

No. 263.

1. COLLISION (§ 81*)—FOG SIGNALS—VESSEL MOORED AT DOCK.

A vessel moored at a dock in a fog is not required to sound fog signals.
[Ed. Note.—For other cases, see Collision, Dec. Dig. § 81.*]

2. COLLISION (§ 85*)—MOVING AND MOORED VESSEL—EXCESSIVE SPEED IN FOG.

A tug with a car float on her side *held* solely in fault for a collision between the float and a tug moored at a dock at Hoboken in a dense fog for navigating in the fog at such speed that she could not stop in time to avoid collision after the moored vessel could be seen.
[Ed. Note.—For other cases, see Collision, Cent. Dig. § 169; Dec. Dig. § 85.*]

Appeal from the District Court of the United States for the Southern District of New York.

Suit in admiralty by the Taylor Dredging Company against the steam tug P. R. R. No. 5; the Pennsylvania Railroad Company, claimant. Decree for libelant, and claimant appeals. Affirmed.

The following is the opinion of Adams, District Judge, in the trial court:

There are two actions involved in this litigation. The first is by the owner of the tug General Newton, to recover for damages to her, and the second by her master for personal injuries, both due to a collision with the Pennsylvania Railroad's tug No. 5, which had a carfloat in tow on her port side, extending considerably ahead of the tug. The proceedings are practically the same in both cases.

The libels allege that on the 23rd of December, 1907, about three o'clock in the afternoon, in a dense fog which had prevailed for some time, No. 5 ran into the steam tug General Newton, which was lying alongside of the Derrick Strongwood, the Derrick lying outside and alongside of a sand scow that was

lying alongside and outside of a lime boat which was made fast to Schultz's Dock in Hoboken.

It is further alleged that the Strongwood was made fast with a bow line running to the lower end of the Consolidated Coal Company's Dock or trestle work just above Schultz's Dock and a stern line to the said scow. The said steamtug. General Newton was made fast with a bow line to the said Company's Dock or trestle work. Then there is some description as to how she was made fast, the bow of the General Newton lapping a little on the said Coal Dock or trestle.

The testimony shows that this tug was lying outside of the scow or vessel that she had been towing and partly on the dock, about two-thirds of it outside of this scow. Inside of this scow were a couple of other boats, so that she was essentially a solid obstruction; there was not any give to her.

It is further alleged that at this time the General Newton discovered through the fog the cars of an approaching carfloat, apparently coming right on to the General Newton at a rapid rate of speed, heading about for her starboard amidships and from a direction across and a little up river from the General Newton and about 100 feet away, which afterwards turned out to be the carfloat No. 36 in tow of the tug No. 5, bound from Thirty-Seventh Street, North River, New York, to Jersey City. This float kept coming on and before anything could be done on the General Newton to avoid collision struck the General Newton bow on, on the Newton's starboard side staving in the bulwarks, house, and so forth.

It appears that the master of the General Newton was in his pilothouse and was severely scalded by escaping steam.

It is alleged that the collision was not because of or through any fault on the part of the General Newton but because of the negligence of the No. 5.

(1) In that said steamtug started out and attempted to navigate in the Hudson River in a dense fog.

(2) In that the said steamtug did not seek an anchorage and did not come to an anchorage in view of the dense fog that was prevailing.

(3) In that the tug did not sooner discover her proximity to the Jersey shore.

(4) In that she did not keep a proper. lookout properly stationed and attending to his duties as such.

(I may say here that the evidence shows there was an ample lookout, so that no negligence is established in that respect.)

(5) In that the tug was navigating at too great a rate of speed.

(6) In that said tug did not slacken her speed or stop or reverse in time to avoid collision.

The Pennsylvania Company's answers are that about 2:20 p. m. the tug No. 5 with a carfloat in tow on her port side left the pier at Thirty-Seventh Street, North River, bound for Harsimus Cove, New Jersey; that at this time the weather was hazy but not thick and boats could be seen across the river; that the tide was ebb and wind light from the southwest; that the carfloat was made fast alongside of the tug in the usual and customary manner and the tug and tow were navigated properly and carefully; that when about abreast of Twenty-Third Street and about in the middle of the Hudson River a heavy fog came up and the weather became very thick and the tug was slowed down and navigated with great caution; that fog signals were blown continuously and two lookouts were on watch, one on top of the cars on the float and the other on the bow of the carfloat; that the weather becoming so thick as to make navigation unsafe it was determined to put in at the Hoboken shops to await clearing weather; that while proceeding at dead slow and navigating with the greatest caution one of the lookouts reported a coal-pocket ahead and the engines of No. 5 were immediately stopped and backed and every effort made to avoid collision, but despite every effort the corner of the carfloat came up against the starboard side of the tug lying alongside of the coal-pocket.

It is alleged that this collision was not in any respect the fault of the No. 5 but was solely due to the fog and thick weather and to the negligence of the General Newton in remaining alongside of the outside of an exposed dock in

such thick weather without giving any warning signals, and especially so upon hearing the signals from the No. 5.

The testimony substantially corresponds with the allegations, that is, that No. 5 took her tow at Thirty-Seventh Street, North River, and proceeded down to the vicinity of Twenty-Third or Twenty-Fourth Street and then turned to go to New Jersey. It is alleged that the fog was not thick at that time, that is, on the part of the tug No. 5, but that it become so and by reason thereof the tug started to go across the river to seek shelter at its own docks above the place where this collision occurred, at Hoboken, and in seeking that harbor she ran into the General Newton, doing the damages claimed and also injuring the pilot who was in the pilothouse of the tug at the time.

It seems to me to be perfectly clear that the Pennsylvania tug was in fault here. She ought not to have been navigating in such weather. She had no right to move about when she could not see where she was going. It has been said here in the testimony, and argued, that it was impossible to see and that the tug did not know where she was. This is true. What should a tug do under those circumstances? If she is caught out she takes the chances. Perhaps she is justified in taking the chances, that she had to navigate we will say, but at a point when the fog became so dense that she knew perfectly well that she could not navigate with any safety, she nevertheless continued on when she could have stopped. It seems to me that when she struck that dense fog she could have kept on the New York side and that in attempting to go over to New Jersey she took all the risks which would ensue from navigating in the fog when she could not see her way. When she came in the vicinity of this boat she does not pretend to have seen it or anything on the shore until she was about 75 feet away and then she saw the coal pockets which were above and back of the boat. She was probably at that time 50 feet away from the boat, and she was then going at a rate of speed which I do not know, the tug says one or two knots an hour. We all know that it is almost impossible for a tug and tow to navigate at one or two knots an hour, but assuming that in this case it was at such a speed, that she could not stop in time to avoid an obstruction which was there and which was concealed from her by the fog. Does the law permit anything of that kind? I do not think so. It says that boats must navigate in a fog in such manner that they will not come into collision. Here a collision occurred, and occurred evidently when the tug and float were going ahead at a considerable rate of speed. We do not know at what rate, but assuming it was two knots an hour that was too high a rate of speed, because the tug could not stop in time to avoid an object which was ahead of her. It was her duty to be under full control of herself if she were going to navigate and to be able to stop in time to avoid collision upon seeing such an object ahead of her. Not being able to do that she should not navigate.

The General Newton was carefully avoiding navigation at the time. She at first made a pier somewhat below the point of collision but was obliged to leave there on account of a change in the tide. She then selected a place slightly above and chose the best she could find. There was no protected place available, but it would have been safe if the No. 5 had been equally careful. When the Taylor heard the No. 5 approach, signals were given by the master who was stationed in the pilothouse. These were doubtless too late to be of service but they tend to show that such precautions were taken.

It seems that when a collision like this takes place between a moving and a motionless boat, the former should bear the consequences.

There will be decrees in favor of the libellants, with orders of reference.

Robinson, Biddle & Benedict (Roderick Terry, Jr., and William S. Montgomery, of counsel), for appellant.

Carpenter & Park, for appellee.

Before LACOMBE, COXE, and NOYES, Circuit Judges.

PER CURIAM. It was conceded at the argument that the General Newton was not at fault for tying up at the coal dock in Hoboken.

That she was not at fault in failing to blow her whistle is manifest, because there is no law requiring her to do so, and, on the contrary, every reason why she should not do so. As was pointed out at the argument, she was moored fast to the dock, and sounding fog signals by her would only have tended to confuse and mislead moving vessels. As there was no fault on the part of the Newton, it is evident that the collision was due either to inevitable accident or to the fault of the No. 5. The case presents no element of inevitable accident. The careless navigation of No. 5 fully accounts for the collision. She was navigating in a fog so dense that she did not see the Newton until she was about 75 feet distant; she was then proceeding at a rate of speed which could not be checked in time to prevent the collision. That she was proceeding at a considerable rate of speed is made plain by the fact that her tow, the carfloat, struck the starboard side of the Newton with such force as to break in her house, sever her steam pipes and shift her boiler. We agree with the district judge, and nothing further need be added to his opinion.

The decree is affirmed, with interest and costs.